525 So.2d 833 (1988)
Martin GROSSMAN, Appellant,
v.
STATE of Florida, Appellee.
No. 68096.
Supreme Court of Florida.
February 18, 1988.
Rehearing Denied May 25, 1988.
*835 Elizabeth G. Mansfield of the Law Office of Gary A. Carnal, St. Petersburg, for appellant.
Robert A. Butterworth, Atty. Gen. and Lauren Hafner Sewell, Asst. Atty. Gen., Tampa, for appellee.
PER CURIAM.
Appellant Martin Grossman appeals his conviction for first-degree murder and his sentence of death. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. We affirm the conviction and sentence.
The facts surrounding the case are as follows. Appellant and a companion, Taylor, drove to a wooded area of Pinellas County on the night of December 13, 1984, to shoot a handgun which appellant had recently obtained by burglarizing a home. Appellant lived in neighboring Pasco County at his mother's home and was on probation following a recent prison term. Wildlife Officer Margaret Park, patrolling the area in her vehicle, came upon the two men and became suspicious. She left her vehicle with the motor, lights, and flashers on, and took possession of appellant's weapon and driver's license. Appellant pleaded with her not to turn him in as having a weapon in his possession and being outside of Pasco County would cause him to return to prison for violation of probation. Officer Park refused the plea, opened the driver's door to her vehicle and picked up the radio microphone to call the sheriff's office. Appellant then grabbed the officer's large flashlight and struck her repeatedly on the head and shoulders, forcing her upper body into the vehicle. Officer Park reported "I'm hit" over the radio and screamed. Appellant continued the attack, and called for help from Taylor, who joined in the assault. Officer Park managed to draw her weapon, a .357 magnum, and fired a wild shot within the vehicle. Simultaneously, she temporarily disabled Taylor by kicking him in the groin. Appellant, who is a large man, wrestled the officer's weapon away and fired a fatal shot into the back of her head. The spent slug exited her head in front and fell into a drinking cup inside the vehicle. Blood stains, high velocity splatters, the location of the spent slug, and the entry and exit wounds show that the victim's upper body was inside the vehicle with her face turned inward or downward at the moment she was killed. Appellant and Taylor took back the seized handgun and driver's license, and fled with the officer's weapon. They returned to the Grossman home, where they told the story of the killing, individually and collectively, to a friend who lived with the Grossmans. The friend, Brian Hancock, and Taylor buried the two weapons nearby. Appellant, who was covered with blood, attempted unsuccessfully to burn his clothes and shoes which Taylor, later disposed of in a nearby lake. Approximately a week later appellant and Taylor, individually and collectively, recounted the story of the murder to another friend, Brian Allan. Approximately eleven days after the murder, Hancock told his story to the police and appellant and Taylor were arrested. Taylor, upon his arrest, recounted the story of the murder to a policeman and, later, appellant told the story to a jailmate, Charles Brewer. Appellant and Taylor were tried jointly over appellant's objection. At trial, the state introduced the *836 testimony of Hancock, Allan, and Brewer against appellant. The state also introduced Taylor's statement to the policeman against Taylor only. In addition, the state introduced the charred shoes, the two weapons, prints taken from the victim's vehicle, testimony from a neighbor who observed the attempted burning of the clothes, appellant's efforts to clean the Grossman van, and the changing of the van tires. Expert testimony as to the cause of death and the significance of blood splatter evidence was also introduced by the state. The jury was instructed that Taylor's admissions to the policeman could only be used against him, not appellant. The jury was instructed on premeditation and felony murder based on robbery, burglary, and escape. A general verdict of first-degree murder was returned against the appellant and Taylor was found guilty of third-degree murder. The judge followed the jury's twelve-to-zero recommendation that the appellant be sentenced to death.
Appellant raises eighteen issues for our consideration: (1) did the trial court err in permitting the introduction of codefendant Taylor's statement in a joint trial with instructions that the statement could only be used against Taylor, not appellant; (2) did the court err in refusing to suppress items found in a warrantless search of the Grossman residence and cars in the residence garage; (3) did the state and court violate Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), by denigrating the importance of the jury recommendation of life or death and by failing to give a requested instruction on the weight to be given to the jury recommendation; (4) did the court err in denying a request for a continuance; (5) did the court err in failing to exclude television cameras from the courtroom and in releasing an evidentiary videotape during the course of the trial; (6) did the court err in denying a subpoena duces tecum for Officer Park's personnel file and in permitting evidence at trial of Officer Park's demeanor and conduct just prior to the murder; (7) did the court err in permitting evidence of appellant's prior burglary during which he obtained a handgun, of other crimes for which appellant was on probation, of appellant's threats to kill Hancock, and of appellant's orders to Hancock to bury the two handguns; (8) did the court err in permitting introduction of a photograph of the victim at the crime scene and of photographs of the victim's head at the autopsy; (9) did the court err in permitting introduction of the shoes and T-shirt recovered from the lake; (10) did the court err in permitting expert testimony on blood splatter evidence; (11) did the court err in instructing the jury on burglary, robbery, and escape as underlying felonies to felony murder; (12) was the evidence sufficient to support the conviction; (13) did the court err in refusing to give a jury instruction that an accomplice's testimony should be received with great caution; (14) did the court err in refusing to give requested penalty phase instructions; (15) did the court err in finding four aggravating factors and no mitigating factors; (16) did the court commit reversible error by failing to enter written findings on the death sentence before the notice of appeal had been filed; (17) is Florida's death penalty unconstitutional on its face and as applied; and (18) was reversible error committed in permitting family members to testify before the sentencing judge on the impact of the murder on the next-of-kin.
We address first those issues which merit only brief comment. On Issue 2, the search in question was conducted with the permission of the homeowner, Mrs. Grossman. Moreover, none of the items seized were introduced into evidence. On Issue 4, appellant had been granted two prior continuances and co-counsel had been appointed to assist counsel in trial preparation. We see no abuse of discretion in denying the third request for a continuance which was filed four days prior to trial. On Issue 5, there is no evidence that the cameras affected the trial and we see no abuse of discretion in denying the motion to exclude the cameras. Maxwell v. State, 443 So.2d 967 (Fla. 1983); State v. Green, 395 So.2d 532 (Fla. 1981); In Re Post-Newsweek Stations, Florida, Inc., 370 So.2d 764 (Fla. 1979). Similarly, the release of the evidentiary videotape could only be prejudicial *837 if we assume that the jury violated its oath and the court instructions not to watch or read news coverage of the trial. We decline to indulge in such an assumption. In Re Post-Newsweek, 370 So.2d at 777. On Issue 6, the personnel record in question was a public record available to appellant and the court invited appellant to submit a more limited subpoena addressed to the specific information desired. Appellant refused to particularize his request. We find no error. As to the evidence of Officer Park's demeanor and the conduct just prior to the murder, Officer Park's movements and conduct in issuing a citation to an uninvolved person minutes before the officer was murdered was relevant evidence which the jury was entitled to hear. On Issue 7, the fact that appellant was on probation for previous crimes and that the theft of a gun violated his probation was relevant to his motive in killing Officer Park when she apprehended him and seized the weapon. The threat to Hancock's life was relevant to Hancock's motivation in notifying the police. The orders to bury the guns indicated a consciousness of guilt and enabled the jury to follow the path of the weapons from the murder scene to the courtroom. On Issue 8, the photographs of the crime scene and the victim's head were relevant evidence of the method and cause of death. Given the nature of the subject, they are not unnecessarily gruesome; relevancy is the test. Foster v. State, 369 So.2d 928, 930 (Fla.), cert. denied, 444 U.S. 885, 100 S.Ct. 178, 62 L.Ed.2d 116 (1979). On Issue 9, the T-shirt was not admitted in evidence. On the question of whether the sneakers admitted into evidence belonged to appellant, the sneakers were partially burned and the jury was presented evidence of their attempted destruction, disposition, and recovery. Whether they belonged to appellant was a jury question. On Issue 10, the expert witness was qualified as a blood splatter expert. We are satisfied that he was qualified and performed sufficient analysis to opine that the splatters were from a high velocity weapon, and that the victim's mortal wound was inflicted inside the vehicle. On Issue 11, there was evidence to support felony murder instructions based on burglary, robbery, and escape. The jury could have believed that the murder was motivated by a desire to escape from custody and to take back from the officer by force the handgun and driver's license. Moreover, the evidence suggests that the victim was beaten or wrestled into the vehicle. On Issue 12, appellant asserts there was insufficient evidence to prove first-degree murder on either a felony murder or premeditation theory. We disagree. There was sufficient evidence to support either or both theories. On premeditation, appellant's fear of going back to prison for violation of probation would not have been satisfied by beating the officer into submission and taking back the handgun and driver's license. Indeed, the assault on the officer only worsened his situation as she could have identified him as her assailant and his vehicle. On the evidence, the jury was entitled to believe that the murder was premeditated. Roberts v. State, 510 So.2d 885 (Fla. 1987); Wilson v. State, 493 So.2d 1019, 1021 (Fla. 1986); Preston v. State, 444 So.2d 939, 944 (Fla. 1984). The argument that appellant makes here, that he merely panicked and killed the officer out of fear, is the same argument he made to the jury and which it rejected. We are satisfied that the evidence was legally sufficient to support the convictions. Tibbs v. State, 397 So.2d 1120 (Fla. 1981), aff'd, 457 U.S. 31, 102 S.Ct. 502, 70 L.Ed.2d 378 (1982). On Issue 13, appellant urges that the jury should have been instructed that witness Hancock was an accomplice and that his testimony should be received with great caution. Hancock was not an accomplice to the murder for which appellant was being tried. The standard jury instructions on witness credibility and the jury's prerogative to believe or disbelieve witnesses adequately covers Hancock's status. On Issue 14, appellant challenges the refusal of the court to give the jury a series of special instructions requested by appellant. The standard jury instructions adequately address appellant's concerns. On Issue 17, appellant argues that seven motions to dismiss should have been granted because Florida's death penalty statute is unconstitutional *838 on its face and as applied. All of appellant's arguments have been previously resolved contrary to his position and merit no comment.
Appellant and his codefendant were tried jointly, and neither testified at trial. Codefendant Taylor's statement to the police was introduced into evidence against Taylor only and the jury was instructed that this statement could not be used against appellant. This was done on the rationale that Taylor's statement interlocked with the three statements that appellant made to witnesses Hancock, Allan, and Brewer. At the time of trial this appeared to be permissible under Parker v. Randolph, 442 U.S. 62, 99 S.Ct. 2132, 60 L.Ed.2d 713 (1979), where a plurality of the court held that interlocking confessions of codefendants could be introduced in a joint trial as an exception to Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), without violating the confrontation clause of the sixth amendment, provided the jury was instructed that the codefendant's statement could only be used against the codefendant. The plurality view of Parker has since been rejected and we must examine this issue in light of Cruz v. New York, ___ U.S. ___, 107 S.Ct. 1714, 95 L.Ed.2d 162 (1987).
Parker was decided on the theory that introduction of the confession of a non-testifying codefendant against the codefendant only, which interlocked with a confession of the defendant, was permissible in a joint trial because it presented nothing of evidentiary value against the defendant which was not already properly before the jury. Consequently, the theory went, the jury could reasonably be expected to follow an instruction that it should not use the non-testifying codefendant's confession against the defendant and, even if it did not, the error would be harmless. In rejecting this theory, the majority in Cruz reasoned:
Quite obviously, what the "interlocking" nature of the codefendant's confession pertains to is not its harmfulness but rather its reliability: If it confirms essentially the same facts as the defendant's own confession it is more likely to be true. Its reliability, however, may be relevant to whether the confession should (despite the lack of opportunity for cross-examination) be admitted as evidence against the defendant, see Lee v. Illinois, 476 U.S. 530 [106 S.Ct. 2056, 90 L.Ed.2d 514] (1986), but cannot conceivably be relevant to whether, assuming it cannot be admitted, the jury is likely to obey the instruction to disregard it, or the jury's failure to obey is likely to be inconsequential.
107 S.Ct. at 1718-19 (emphasis in original). The Court then went on to make three holdings, all of which are applicable here. First, it is error to admit a non-testifying codefendant's confession incriminating the defendant notwithstanding an instruction not to consider it against the defendant. This is so even if the defendant's own interlocking confession is admitted. Second, the defendant's confession may be considered as an indica of reliability in determining whether the codefendant's confession may be directly admissible against the defendant. Third, in recognition that its ruling would impact on trials already conducted under the Parker theory, the Court held that the defendant's confession could be considered on appeal in determining whether admission of the codefendant's confession was harmless.
It is clear from Cruz that admission of Taylor's statement with instructions that it not be used against appellant was error. It is also clear from the record that this error was harmless. Taylor's statement interlocks with and is fully consistent in all significant aspects with all three statements that appellant made to Hancock, Allan, and Brewer and which were directly admissible against appellant. The indicia of reliability are sufficient to have permitted introduction of Taylor's statement as evidence against appellant. Appellant makes two arguments that this is not so, both of which are contrary to the record. First, he argues that it is only Taylor's statement which emphasizes appellant's primary role in the murder. This is contrary to the record which shows that appellant told Hancock, Allan, and Brewer *839 that it was he who first attacked and battered the officer and that it was he who wrestled her weapon away and fired the single shot which killed her. In all three statements, Taylor's role is clearly subordinate while appellant's role as the initiator and triggerman is dominant. Second, appellant argues, he and Taylor jointly recounted the story of the murder to Hancock and Allan and neither witness was able to identify for the court which defendant said what. This is contrary to the record which shows that the witnesses were able for the most part to identify appellant as the person who narrated the critical elements of the story. Moreover, even if this were not true, the joint statements of appellant and Taylor given in each other's presence would be admissible against both as admissions against penal interest. We hold that it was error to admit Taylor's statement in the joint trial as evidence against Taylor only, but that this error was harmless under the facts and circumstances of the case. Cruz; Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969).
In a two-pronged argument, appellant argues that the sentencing role of the jury was unconstitutionally denigrated by the state and that the jury was not properly instructed on the great weight which would be given to its advisory recommendation on life imprisonment or the death penalty. Caldwell; Tedder v. State, 322 So.2d 908 (Fla. 1975). During the jury voir dire, several potential jurors indicated misgivings about their ability to impose the death penalty. Instead of attempting to challenge the jurors for cause as permitted by Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 88 L.Ed.2d 841 (1985), the state sought to reassure the jurors that the jury role was to make an advisory recommendation to the judge and that the judge had the ultimate responsibility for sentencing to death. Florida's death penalty statute, section 921.141, Florida Statutes (1983), provides that the jury shall hear the evidence on aggravation and mitigation and render an advisory sentence based on whether there are sufficient aggravating circumstances to warrant a death sentence, and, if so, whether there are sufficient mitigating circumstances to outweigh the aggravating circumstances. The statute goes on to provide that, notwithstanding the recommendation of the jury, the judge shall weigh the aggravating and mitigating circumstances and enter a sentence of life imprisonment or death based on the judge's weighing process. In the event the death sentence is imposed, the judge is required to set forth in writing the findings on which the death sentence is based. It is these written findings of fact and the trial record which furnish the basis for this Court's review of the death sentences. It is clear then, that the prosecutor correctly stated the law in Florida: the judge is the sentencing authority and the jury's role is merely advisory. Thus, Caldwell, which addressed the denigration of the jury acting as a sentencer is clearly distinguishable. Combs v. State, 525 So.2d 853 (Fla. 1988); Aldridge v. State, 503 So.2d 1257, 1259 (Fla. 1987); Pope v. Wainwright, 496 So.2d 798, 804 (Fla. 1986), cert. denied, ___ U.S. ___, 107 S.Ct. 1617, 94 L.Ed.2d 801 (1987); Darden v. State, 475 So.2d 217, 221 (Fla. 1985).
In the second prong to this argument, appellant urges that the failure of the court to instruct the jury that its recommended sentence would be given great weight so misled the jury as to violate Caldwell. In Tedder, we held "[a] jury recommendation under our trifurcated death penalty statute should be given great weight" and, in order to sustain an override by the trial judge of a jury recommendation of life[1] "the facts suggesting a sentence of death should be so clear and convincing that virtually no reasonable person could differ." Tedder, 322 So.2d at 910. The jury here recommended death but appellant argues that the deference paid to the jury recommendation under Tedder is so great that the jury becomes the de facto, *840 if not de jure, sentencer and our standard jury instructions do not adequately inform the jury of the overwhelming power it possesses to determine the sentence. Thus, appellant urges, had the jury understood the very nearly conclusive impact of its recommendation under Tedder, it might have recommended life imprisonment. We are not persuaded that the weight given to the jury's advisory recommendation is so heavy as to make it the de facto sentence. Our case law contains many instances where a trial judge's override of a jury recommendation of life has been upheld. See Craig v. State, 510 So.2d 857 (Fla. 1987), cert. denied, ___ U.S. ___, 108 S.Ct. 732, 98 L.Ed.2d 680 (1988), and cases cited therein. Notwithstanding the jury recommendation, whether it be for life imprisonment or death, the judge is required to make an independent determination, based on the aggravating and mitigating factors. Randolph v. State, 463 So.2d 186, 192 (Fla. 1984), cert. denied, 473 U.S. 907, 105 S.Ct. 3533, 87 L.Ed.2d 656 (1985); Engle v. State, 438 So.2d 803, 813 (Fla. 1983), cert. denied, 465 U.S. 1074, 104 S.Ct. 1430, 79 L.Ed.2d 753 (1984); Ross v. State, 386 So.2d 1191, 1197 (Fla. 1980). Moreover, this procedure has been previously upheld against constitutional challenge. Spaziano v. Florida, 468 U.S. 447, 466, 104 S.Ct. 3154, 3165, 82 L.Ed.2d 340 (1984); Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976). In the penalty phase of a capital proceeding, the jury is instructed, in pertinent part, that although the final responsibility for sentencing is with the judge, that it should not act hastily or without due regard to the gravity of the proceedings, that it should carefully weigh, sift, and consider evidence of mitigation and statutory aggravation, realizing that human life is at stake, and bring to bear its best judgment in reaching the advisory sentence. We are satisfied that these instructions fully advise the jury of the importance of its role and correctly state the law.
The sentencing order found four aggravating circumstances: (1) the murder was committed while engaged in the commission of or an attempt to commit, or flight after committing or attempting to commit, the crime of robbery or burglary; (2) the murder was committed for the purpose of avoiding or preventing a lawful arrest; (3) the murder was committed to disrupt or hinder the lawful exercise of a government function or the enforcement of laws; and (4) the murder was especially wicked, evil, atrocious, or cruel. Numbers two and three were treated as one circumstance by the trial judge. Appellant argues that none of these aggravating circumstances are present. We disagree. Concerning number one, it is clear from the evidence that appellant's handgun and driver's license and the victim's handgun were forcibly taken and that the struggle occurred at least in part inside the victim's vehicle. Thus, both a burglary and a robbery occurred. Concerning aggravating factors two and three, it is clear from the evidence that appellant advised the officer that he was in violation of his probation and that he committed the murder to escape from, avoid, or prevent, an arrest and to disrupt or hinder the enforcement of the probation laws. Moreover, the evidence also shows that the handgun in his possession was obtained illegally, which fact would have been revealed had he not escaped and taken back the weapon. As to aggravating factor four, appellant argues that death occurred almost instantaneously and that there were no additional acts to set the crime apart from the norm. This argument overlooks the fact that the murder was preceded by a brutal beating. Appellant's statements indicate that he struck the officer twenty to thirty times with a heavy-duty flashlight but was unable to beat her into unconsciousness or to subdue her despite his large size and the assistance of Taylor.[2] The ferocity of the attack and the ferocity with which the officer defended herself, coupled with her knowledge that appellant was attacking to prevent a return to prison, lead inevitably to the conclusion *841 that she knew she was fighting for her life and knew that if she was subdued or her weapon taken, her life would be forfeited.[3] Under these circumstances, we are satisfied that the trial judge did not abuse his discretion in finding that the murder was heinous, atrocious, and cruel. Wilson v. State, 436 So.2d 908, 912 (Fla. 1983). Appellant also argues that there was substantial evidence that he had no prior history of violence, he had a deprived and difficult adolescence, he was only nineteen, he expressed remorse for the crime, and he had been a well-behaved and cooperative prisoner. Neither the jury nor the judge was sufficiently impressed by this evidence to find that it outweighed the aggravating circumstances. We see no error. Roberts and cases cited therein; Tedder.
Appellant's next point is that the sentence should be overturned because the trial judge did not enter his written findings until three months after orally sentencing him to death. Appellant argues that the circumstances here are virtually identical to those in Van Royal v. State, 497 So.2d 625 (Fla. 1986). We disagree. The judge's written findings were made prior to the certification of the record to this Court. It is not determinative that these written findings were made after the notice of appeal was filed seven days after the oral pronouncement of sentence. Under our death penalty statute, appeal is automatic and under Florida Rule of Appellate Procedure 9.140(b)(4), governing capital appeals, the trial court retains concurrent jurisdiction for preparation of the complete trial record for filing in this Court. Muehleman v. State, 503 So.2d 310 (Fla.), cert. denied, ___ U.S. ___, 108 S.Ct. 39, 98 L.Ed.2d 170 (1987).
Since Van Royal issued we have been presented with a number of cases in which the timeliness of the trial judge's sentencing order filed after oral pronouncement of sentence has been at issue. In Van Royal and its progeny, we have held on substantive grounds that preparation of the written sentencing order prior to the certification of the trial record to this Court was adequate. At the same time, however, we have stated a strong desire that written sentencing orders and oral pronouncements be concurrent. Patterson v. State, 513 So.2d 1257 (Fla. 1987); Muehleman. We recognize that the trial court here, and the trial court in other cases which have reached us or will reach us in the near future, have not had the benefit of Van Royal and its progeny. Nevertheless, we consider it desirable to establish a procedural rule that all written orders imposing a death sentence be prepared prior to the oral pronouncement of sentence for filing concurrent with the pronouncement. Accordingly, pursuant to our authority under article V, section 2(a), of the Florida Constitution, effective thirty days after this decision becomes final, we so order.
Since the briefs and arguments on this case were presented to the Court, the United States Supreme Court has issued Booth v. Maryland, ___ U.S. ___, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), holding that introduction of victim impact evidence to a capital punishment sentencing jury violated the eighth amendment to the United States Constitution. Because our record review revealed that such victim impact evidence was presented to the sentencing judge, but not to the jury, we ordered that supplemental briefs be submitted on the impact of Booth on the case at hand.
In Booth, the defendant chose to be sentenced by a jury. In accordance with Maryland law, a mandatory victim impact statement was prepared and submitted to the jury. The thrust of this evidence was twofold. First, that the two victims were exceptionally kind and gentle persons and the bereavement of the family was severe. Second, and following from the first, there was no conceivable excuse for murdering such persons and execution was the appropriate penalty. The Booth court concluded that such evidence of victim impact was irrelevant to any legitimate sentencing consideration in capital punishment cases and *842 that introduction of such evidence created a constitutionally unacceptable risk that the jury may impose the death penalty in an arbitrary and capricious manner. Consequently, the Maryland statute was held to be invalid insofar as it required victim impact information to be considered in capital punishment cases.[4]
Florida's death penalty statute, section 921.141, limits the aggravating circumstances on which a sentence of death may be imposed to the circumstances listed in the statute. § 921.141(5). The impact of the murder on family members and friends is not one of these aggravating circumstances. Thus, victim impact is a non-statutory aggravating circumstance which would not be an appropriate circumstance on which to base a death sentence. Blair v. State, 406 So.2d 1103 (Fla. 1981); Miller v. State, 373 So.2d 882 (Fla. 1979); Riley v. State, 366 So.2d 19 (Fla. 1978). Florida law provides, however, that prior to sentencing any defendant convicted of a homicide, the next-of-kin of the homicide victim will be permitted to either appear before the court or to submit a written statement under oath for the consideration of the sentencing court. These statements shall be limited solely "to the facts of the case and the extent of any harm, including social, psychological, or physical harm, financial losses, and loss of earnings directly or indirectly resulting from the crime for which the defendant is being sentenced." § 921.143(2), Fla. Stat. (1985). Thus, it is clear that the Florida Legislature, like Congress and the legislature of at least thirty-five other states, has made the judgment "that the effect of the crime on the victims should have a place in the criminal justice system." Booth, 107 S.Ct. at 2536 n. 12. It is also clear, however, from the Booth decision, that the legislature may not make this judgment in capital punishment cases. Accordingly, we hold that the provisions of section 921.143 are invalid insofar as they permit the introduction of victim impact evidence as an aggravating factor in death sentencing.[5]
The first question is whether appellant's failure to object to the introduction of the victim impact evidence is a procedural bar to raising the issue on appeal. Victim impact is not one of the aggravating factors enumerated in section 921.141. We have previously held that "[t]he aggravating circumstances specified in the statute are exclusive, and no others may be used for that purpose." Miller, 373 So.2d at 885. Thus, appellant was entitled to object to the introduction of the evidence. The state correctly points out that appellant made no objection, whereas in Booth there was an objection to such evidence. There is nothing in the Booth opinion which suggests that it should be retroactively applied to the cases in which victim impact evidence has been received without objection. Except for fundamental error, an appellate court will not consider an issue unless it was presented to the lower court. Steinhorst v. State, 412 So.2d 332 (Fla. 1982). Therefore, we hold that by his failure to make a timely objection, appellant is procedurally barred from claiming relief under Booth.
While our consideration of the Booth issue could stop at this point, for the benefit of the bench and the bar we choose to also discuss whether, had an objection been made, the error could be deemed harmless.
Appellant does not argue that harmless error analysis may not be applied to Booth errors, but we consider it necessary to consider the question in view of its importance.[6] We begin our consideration by noting *843 that the Booth court did not specifically state whether harmless error analysis was permitted, presumably because the issue was not raised. However, its disposition of the case does not rule out application of harmless error and, normally, the Court finds it desirable to leave the determination of harmless error, in the first instance, to the lower court. Rose v. Clark, 478 S.Ct. 570, 106 S.Ct. 3101, 3109, 92 L.Ed.2d 460 (1986); Delaware v. Van Arsdall, 475 U.S. 673, 684, 106 S.Ct. 1431, 1438, 89 L.Ed.2d 674 (1986); United States v. Hasting, 461 U.S. 499, 510, 103 S.Ct. 1974, 1981, 76 L.Ed.2d 96 (1983).
In Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), the Court held that the determination of whether violation of a federal constitutional right could be held harmless was the responsibility of the United States Supreme Court, in the absence of appropriate Congressional action, and could not be left to the states themselves. Further, the Court held, not all violations of the federal constitution mandate reversal of a conviction and that only three constitutional rights had been identified as "so basic to a fair trial that their infraction can never be treated as harmless error." Id. at 23, 87 S.Ct. at 827-828 (footnote omitted).[7] Since Chapman issued, "the Court has consistently made clear that it is the duty of a reviewing court to consider the trial record as a whole and to ignore errors that are harmless, including most constitutional violations." Hasting, 461 U.S. at 509, 103 S.Ct. at 1980 (citations omitted). In Van Arsdall, the Court emphasized again the application and rationale of the Chapman rule.
As we have stressed on more than one occasion, the Constitution entitles a criminal defendant to a fair trial, not a perfect one. E.g., United States v. Hasting, 461 U.S. 499, 508-509, 103 S.Ct. 1974, 1980, 76 L.Ed.2d 96 (1983); Bruton v. United States, 391 U.S. 123, 135, 88 S.Ct. 1620, 1627, 20 L.Ed.2d 476 (1968). In Chapman, this Court rejected the argument that all federal constitutional errors, regardless of their nature or the circumstances of the case, require reversal of a judgment of conviction. The Court reasoned that in the context of a particular case, certain constitutional errors, no less than other errors, may have been "harmless" in terms of their effect on the factfinding process at trial. Since Chapman, we have repeatedly reaffirmed the principle that an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt.
Van Arsdall, 475 U.S. at 681, 106 S.Ct. at 1436. In Rose, the Court stressed again the limited number of exceptions to the harmless error rule.
We have emphasized, however, that while there are some errors to which Chapman does not apply, they are the exception and not the rule. United States v. Hasting, 461 U.S., at 509, 103 S.Ct., at 1980. Accordingly, if the defendant had counsel and was tried by an impartial adjudicator, there is a *844 strong presumption that any other errors that may have occurred are subject to harmless error analysis. The thrust of the many constitutional rules governing the conduct of criminal trials is to ensure that those trials lead to fair and correct judgments. Where a reviewing court can find that the record developed at trial establishes guilt beyond a reasonable doubt, the interest in fairness has been satisfied and the judgment should be affirmed. As we have repeatedly stated, "the Constitution entitles a criminal defendant to a fair trial, not a perfect one." Delaware v. Van Arsdall, 475 U.S., at 679-681, 106 S.Ct., at 1436; United States v. Hasting, supra, at 508-509, 103 S.Ct., at 1980.
Rose v. Clark, 106 S.Ct. at 3106-07 (emphasis added). It is clear then, that with the exceptions noted, there is a strong presumption that constitutional errors are subject to harmless error analysis.
We turn then to the general question of whether harmless error analysis may be applied to the sentencing phase of capital punishment cases and the more specific question of whether a Booth error may ever be held harmless. On the general question, it is clear that harmless error analysis is applicable to capital sentences. This Court routinely applies harmless error analysis to, and affirms, death sentences where the judge has improperly found invalid aggravating factors provided one or more valid aggravating factors exist which are not overridden by one or more mitigating factors. White v. State, 446 So.2d 1031 (Fla. 1984); Sims v. State, 444 So.2d 922 (Fla. 1983) cert. denied, 467 U.S. 1246, 104 S.Ct. 3525, 82 L.Ed.2d 832 (1984); Alford v. State, 307 So.2d 433 (Fla. 1975), cert. denied, 428 U.S. 912, 96 S.Ct. 3227, 49 L.Ed.2d 1221 (1976). Even more significantly, in Barclay v. Florida, 463 U.S. 939, 103 S.Ct. 3418, 77 L.Ed.2d 1134 (1983), the Court specifically approved the application of harmless error analysis to death sentences and held that consideration by the trial judge of an invalid aggravating circumstance does not, per se, render the imposition of a death sentence unconstitutional.
We turn now to the specific question of whether Booth errors are one of those rare exceptions to Chapman where the violation is so basic and pervasive that the infraction can never be treated as harmless error. The Booth court summarized the impact evidence and its finding as follows.
The VIS [Victim Impact Statement] in this case provided the jury with two types of information. First, it described the personal characteristics of the victims and the emotional impact of the crimes on the family. Second, it set forth the family members' opinions and characterizations of the crimes and the defendant. For the reasons stated below, we find that this information is irrelevant to a capital sentencing decision, and that its admission creates a constitutionally unacceptable risk that the jury may impose the death penalty in an arbitrary and capricious manner.
Booth, 107 S.Ct. at 2533 (emphasis added). The Court's first finding, that such evidence is irrelevant, poses no problem for harmless error analysis. Conceptually, this is the easiest type of error to analyze because the impermissible evidence can be easily isolated from the permissible evidence. If the reviewing court can say beyond a reasonable doubt that the death sentence would have been imposed had the irrelevant evidence not been introduced, the error is harmless; if the court cannot say this beyond a reasonable doubt, the error is harmful. The second finding, that the evidence may cause juries to impose the death penalty in an arbitrary and capricious manner, is more difficult to analyze, but by no means intractable. The use of the word "may" and the internal analysis of the Booth court show that some victim impact statements will differ in impact from others. This is consistent with common sense and experience. Indeed, the very logic of the Court suggests that some Booth errors are harmless. In illustrating why the impact on family members was impermissible aggravation, the court made the following revealing statement of its reasoning.
As evidenced by the full text of the VIS in this case, see Appendix to this opinion, the family members were articulate *845 and persuasive in expressing their grief and the extent of their loss. But in some cases the victim will not leave behind a family, or the family members may be less articulate in describing their feelings even though their sense of loss is equally severe. The fact that the imposition of the death sentence may turn on such distinctions illustrates the danger of allowing juries to consider this information. Certainly the degree to which a family is willing and able to express its grief is irrelevant to the decision whether a defendant, who may merit the death penalty, should live or die. See [Booth v. State] 306 Md., [172] at 223, 507 A.2d, [1098] at 1129 (Cole, J., concurring in part and dissenting in part) (concluding that it is arbitrary to make capital sentencing decisions based on a VIS, "which vary greatly from case to case depending upon the ability of the family member to express his grief").
Booth, 107 S.Ct. at 2534. Similarly, the Court also noted that the character and reputation of the victim would vary widely, some would be sterling members of the community, others would be of questionable character. Thus, the Court, in large part, grounded its decision that systematically imposing the death penalty based on such evidence would be arbitrary and capricious in violation of the eighth amendment on the rationale that such irrelevant evidence would sometimes impel the sentencer to impose death, i.e., would be harmful in those cases, but, in other cases, would not so impel the sentencer, i.e., would be harmless. This would result in a capital punishment system which arbitrarily and capriciously imposed death sentences. In short, because some Booth errors will be harmful and some will not, the system will be arbitrary and capricious, i.e., lack uniformity. It can be seen, then, that the rationale of Booth permits harmless error analysis. We hold that the erroneous introduction of victim impact evidence is subject to harmless error analysis on a case-by-case basis.
We turn now to application of harmless error analysis using State v. DiGuilio, 491 So.2d 1129 (Fla. 1986). We begin by noting the salient distinction between Booth and the case here. In Booth, the sentencing authority which heard the victim impact evidence was a jury; here the sentencing authority which heard the evidence was a judge mandated by case law to give great weight to the jury's recommendation of death. Ross; LeDuc; Tedder. For the following reasons we conclude beyond a reasonable doubt that the sentencing judge would have imposed the death penalty in the absence of the victim impact evidence. First, under section 921.141, the sentencing judge's consideration of aggravating circumstances on which a death penalty may be based is limited to those enumerated in the statute. The statute does not include impact of the murder on the family as an aggravating circumstance. The judge is required to set out in writing for appellate review the findings on which the death sentence is based. The written findings here show that there was no reliance, or even a hint of reliance,[8] on the *846 evidence introduced regarding the impact of the murder on the next of kin.[9] Second, the trial judge found four aggravating circumstances, all of which are valid, and no mitigating circumstances. The balance in favor of imposing the death sentence is overwhelming. In view of this balance and the fact that the jury recommended death, the trial judge's actual discretion here was relatively narrow. Third, for the purposes of appellate review, the case is analogous to those cases where we affirm death sentences based on valid aggravating circumstances and no mitigation even though the sentence judge has found and relied on invalid aggravating circumstances. Finally, the record shows that the jury did not receive the improper evidence of victim impact, but recommended death by a twelve-to-zero vote based on the evidence of statutory aggravating circumstances only. A jury recommendation of death, reflecting the conscience of the community, is entitled to great weight. Ross; LeDuc. More significantly, from the viewpoint of harmless error analysis, it shows that all twelve members of the jury, who were not exposed to the irrelevant evidence, were persuaded that death was the appropriate penalty based on the permissible evidence. We are persuaded beyond a reasonable doubt that the death penalty would have been imposed absent the impermissible evidence. We hold (1) that appellant is procedurally barred from contesting the receipt of victim impact evidence and (2) that the receipt of such evidence in this case was harmless error.
We affirm appellant's conviction and sentence.
It is so ordered.
McDONALD, C.J., and OVERTON, EHRLICH and GRIMES, JJ., concur.
SHAW, J., concurs specially with an opinion.
KOGAN, J., concurs in result only.
BARKETT, J., concurs in part and dissents in part with an opinion.
SHAW, Justice, specially concurring.
I agree fully with the majority's disposition of the issues presented. However, concerning Issue 3, I believe that Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), and Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), call for a reexamination of the Tedder[1] rule concerning the weight to be assigned to the jury's advisory recommendation on sentencing.
In Tedder, a young husband kidnapped his estranged wife and infant son from the home of his mother-in-law and, in the course of doing so, murdered the mother-in-law. *847 The jury recommended life imprisonment. The judge, however, sentenced Tedder to death on the basis of three aggravating and no mitigating circumstances: (1) the murderer knowingly created a great risk of death to many persons; (2) the murder was especially heinous, atrocious, and cruel; and, (3) the murder was committed in the course of a kidnapping. We reversed the death sentence on the basis that the "jury recommendation under our trifurcated death penalty statute should be given great weight" and "[i]n order to sustain a sentence of death following a jury recommendation of life, the facts suggesting a sentence of death should be so clear and convincing that virtually no reasonable person could differ." Tedder at 910. It is readily apparent from the facts of Tedder that aggravating factors one and two were invalid. Moreover, even the aggravating factor of kidnapping, although valid, carried less weight than normal because the murder and kidnapping occurred in the context of a domestic quarrel. Wilson v. State, 493 So.2d 1019 (Fla. 1986); Ross v. State, 474 So.2d 1170 (Fla. 1985). On the facts of the case, this was simply not a case in which the death penalty was warranted. Even if the jury had recommended death, we would have been constrained under a proportionality review to reverse because this was clearly not one of the more aggravated and indefensible crimes for which the death penalty is appropriate. State v. Dixon, 283 So.2d 1, 8 (Fla. 1973), cert. denied, 416 U.S. 943, 94 S.Ct. 1950, 40 L.Ed.2d 295 (1974). Thus, Tedder itself does not rely on or test the Tedder rule.
In Tedder we gave no reasoned explanation of why a jury recommendation was entitled to great weight, we merely concluded that it was and cited Florida's death penalty statute as authority. Section 921.141, Florida Statutes (1973 and thereafter) provides that "notwithstanding" the jury recommendation the trial court will weigh the evidence of aggravation and mitigation and "shall" enter a sentence based on that weighing. The Florida death statute thus makes the judge the sentencer subject to a weighing of the aggravating and mitigating circumstances and assures sufficient basis for appellate review by requiring that in instances where the judge imposes a sentence of death, he shall set forth in writing the findings upon which the sentence is based. The statute simply cannot be read to require that a judge follow the jury's recommendation of life unless "the facts suggesting a sentence of death [are] so clear and convincing that virtually no reasonable person could differ." Tedder 322 So.2d at 910. Under Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), and its progeny, the sentencer is not at liberty to ignore the factual balance between the aggravating and mitigating evidence.
Under Florida law, the sentencing judge is required to impose the death penalty on all first-degree murderers as to whom the statutory aggravating factors outweigh the mitigating factors. There is good reason to anticipate, then, that as to certain categories of murderers, the penalty will not be imposed freakishly or rarely but will be imposed with regularity; and consequently it cannot be said that the death penalty in Florida as to those categories had ceased "to be a credible deterrent or measurably to contribute to any other end of punishment in the criminal justice system." Furman v. Georgia, 408 U.S. 238, 311, [92 S.Ct. 2726, 33 L.Ed.2d 346] (1972) (White, J., concurring). Accordingly, the Florida statutory scheme for imposing the death penalty does not run afoul of this Court's holding in Furman v. Georgia.

Proffitt v. Florida, 428 U.S. 242, 260-61, 96 S.Ct. 2960, 2970, 49 L.Ed.2d 913 (1976) (White, J., concurring) (emphasis in original). It would appear, therefore, that Florida's scheme for imposing the death penalty would pass constitutional muster without the benefit of Tedder in that it designates the sentencer and spells out an easily reviewable criteria which must be set forth in writing when the death penalty is imposed. While there is nothing constitutionally wrong with death penalty systems which place the sentencing responsibility upon the jury and require a factual finding *848 on which to base appellate review, and many prefer that system, our legislature in its wisdom has decided otherwise. We must defer to that legislative decision.
The Tedder rule injected confusion into the Florida scheme by making the jury, by its recommendation, the virtual sentencer without requiring that the jury articulate any factual findings upon which it based its recommendation and making the jury's recommendation binding upon the trial judge unless "the facts suggesting a sentence of death are so clear and convincing that virtually no reasonable person could differ." We thus end up with the very evil that Furman found objectionable.[2] Moreover, the facts of Tedder do not support or test the rule because the judge's sentencing order, standing alone and notwithstanding the jury recommendation, did not support a sentence of death. A true test of the validity of the Tedder rule requires a factual situation where the sentencing order of death, notwithstanding the jury recommendation, is valid and would be affirmed except for the Tedder rule of deference to the jury's recommendation of life. To follow Tedder under those circumstances in the face of our statute clearly violates Furman by imposing, or not imposing, the death penalty in an arbitrary and capricious manner. We recognized this in rejecting a double jeopardy challenge in Spaziano v. State, 433 So.2d 508, 512 (Fla. 1983).
First, the jury's function under the Florida death penalty statute is advisory only. See Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976). Second, allowing the jury's recommendation to be binding would violate Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).
See also Spaziano v. Florida, 468 U.S. 447, 453-54, 104 S.Ct. 3154, 3158-3159, 82 L.Ed.2d 340 (1984), where the Court affirmed our denial of the double jeopardy challenge and noted our "understanding that allowing the jury's recommendation to be binding would violate the requirements of Furman... ." This understanding is correct in light of our particular statute which places no requirement upon the jury to justify or give a reason for its recommendation. In short, where a judge overrides the advisory recommendation of a jury, we should only defer to the jury's advisory recommendation if we find that the judge's sentencing order, standing alone, does not support the imposition of death.
The above conclusion is also supported by an analysis of Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), and Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). In Witherspoon, the Court was concerned with the automatic exclusion from capital punishment juries of persons who opposed the death penalty or who had conscientious scruples against capital punishment. The Court held that opponents of capital punishment could not be excluded from such juries unless they expressed the view that they could not make an impartial decision on guilt or could never vote to impose the death penalty. Tedder is actually grounded on the Witherspoon principle that juries reflect the conscience of the community and it is this conscience which should determine whether death is the appropriate penalty.[3] This Witherspoon concept of the jury as a cockpit in which the jurors argue out their religious, ideological, and political views of capital punishment was at tension with the concept of the jury as an impartial, non-emotional, fact-finding body following the law as given to it by the court. One year prior to Furman, the Court upheld, against due process and equal protection challenges, the imposition of the death penalty by juries acting, without standards *849 or substantive instructions, as the conscience of the community. McGautha v. California, 402 U.S. 183, 91 S.Ct. 1454, 28 L.Ed.2d 711 (1987). This holding was contingent on the selection of the jury in accordance with the precepts of Witherspoon. Id. at 185 n. 1, 91 S.Ct. at 1456 n. 1.[4]Furman did not explicitly override McGautha and Witherspoon, but implicitly found that imposition of the death penalty based on the conscience of the community principle was cruel and unusual punishment because it resulted in the arbitrary and capricious imposition of the death penalty. Although it did not override McGautha and Witherspoon, Furman did restore the jury to its traditional role as a finder-of-fact whose discretion was strictly limited and whose findings of fact on the imposition of the death penalty would be subject to judicial review. The substantial tension, if not outright conflict, between the Witherspoon and Furman concepts of the jury role in capital sentencing was not resolved until Witt issued in 1985.
In Witt the Court revisited and clarified Witherspoon. In doing so, the Court recognized the inherent incompatibility of Witherspoon and Furman.
There is good reason why the Adams [448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980)] test is preferable for determining juror exclusion. First, although given Witherspoon's facts a court applying the general principles of Adams could have arrived at the "automatically" language of Witherspoon's footnote 21, we do not believe that language can be squared with the duties of present-day capital sentencing juries (emphasis supplied). In Witherspoon the jury was vested with unlimited discretion in choice of sentence. Given this discretion, a juror willing to consider the death penalty arguably was able to "follow the law and abide by his oath" in choosing the "proper" sentence. Nothing more was required. Under this understanding the only veniremen who could be deemed excludable were those who would never vote for the death sentence or who could not impartially judge guilt.

After our decisions in Furman v. Georgia, 408 U.S. 238, [92 S.Ct. 2726, 33 L.Ed.2d 346] (1972), and Gregg v. Georgia, 428 U.S. 153, [96 S.Ct. 2909, 49 L.Ed.2d 859] (1976), however, sentencing juries could no longer be invested with such discretion (emphasis supplied). As in the State of Texas, many capital sentencing juries are now asked specific questions, often factual, the answers to which will determine whether death is the appropriate penalty. In such circumstances it does not make sense to require simply that a juror not "automatically" vote against the death penalty; whether or not a venireman might vote for death under certain personal standards, the State still may properly challenge that venireman if he refuses to follow the statutory scheme and truthfully answer the questions put by the trial judge. To hold that Witherspoon requires anything more would be to hold, in the name of the Sixth Amendment right to an impartial jury, that a State must allow a venireman to sit despite the fact that he will be unable to view the case impartially.
Witt, 469 U.S. at 421-22, 105 S.Ct. at 851 (footnote omitted).
Witt has two effects on our Tedder decision. First, Witt makes clear that Witherspoon, as applied, permitted jurors who were personally biased to participate in the decision to recommend life or death. Under Witherspoon, the state was not permitted to challenge jurors for cause unless they made it unmistakably clear that they would automatically vote against the death penalty regardless of the evidence developed at trial. This meant that the trial court had no way of ensuring that the jurors' discretion would be guided by aggravating and mitigating circumstances and not by their personal beliefs. From a Furman viewpoint, this decreased the reliability of the jury recommendation because *850 it increased the likelihood that juries would act arbitrarily and capriciously based on personal biases. Witt, by spelling out standards for determining when prospective jurors may be excluded for cause because of their views on capital punishment, increased the likelihood that jurors will impartially follow the law as announced by the trial judge and not their personal views on the death penalty. Witt should reduce the Witherspoon gap between the views of the judge and jury and the number of occasions where they disagree on the sentence. It should also reduce the likelihood that the death penalty will be arbitrarily and capriciously imposed.
A second impact of Witt is to take the constitutional ground, Witherspoon, out from under Tedder. Arguably, as long as Witherspoon stood unamended, it could be said that there was some constitutional basis for great deference to the jury recommendation as the conscience of the community. However, as Witt makes clear, the role of the jury under Witherspoon cannot be squared with the role of the jury under Furman and it is Furman which controls. This point is reinforced by the structure of the Florida death penalty system. Under our statute, the trial judge is the sentencer and renders the written findings on which we base our constitutionally required review. When we apply Tedder, we have no factual findings from the jury to review and can only speculate as to the reasons underlying the jury recommendation. In effect, from a cold record, we attempt to find the facts supporting the jury's recommendation. Skene, Review of Capital Cases: Does The Florida Supreme Court Know What It's Doing?, 15 Stetson L.Rev. 263, 298-306 (Spring 1986). While it is constitutionally permissible for either the jury or the judge to act as sentencer, Tedder tends to transform our system into a hybrid. Contrast Tedder with Jurek v. Texas, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976) and Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), where the jury is the sentencer and is required to make specific findings of fact to support a death sentence and the jury's findings furnish a basis for appellate review.
There are two pertinent and controlling propositions of law to be drawn from Furman and its progeny. First, it is cruel and unusual punishment to impose the death penalty on a particular defendant if the penalty is disproportionate to the facts surrounding the particular murder. The penalty should be reserved for the most aggravated and unmitigated crimes. State v. Dixon, 283 So.2d 1, 7 (Fla. 1973). Second, from a systemic viewpoint, the system must impose the penalty with regularity, not arbitrarily or capriciously. This is done by "rationally distinguish[ing] between the individuals for whom death is an appropriate sanction and those for whom it is not." Spaziano, 468 U.S. at 460, 104 S.Ct. at 3162. Undifferentiated deference, by either this Court or sentencing courts, to unsupported and unreviewable jury recommendations does not meet either of the two propositions.
Caldwell also impacts on the viability of the Tedder rule. In Caldwell, the error consisted of denigrating the role of the sentencing jury by suggesting that the responsibility for the sentence rested elsewhere; and, the Court held, it was constitutionally impermissible to rest a death sentence on a determination made by a sentencer who had been led to believe that the responsibility for the sentence rested elsewhere. I am not persuaded that our application of Tedder violates Caldwell. Combs v. State, 525 So.2d 853 (Fla. 1988). However, I do suggest that the Tedder rule unnecessarily obscures and confuses the identity of the sentencer in Florida. Our statute unquestionably makes the judge the sentencer, but Tedder in its practical application has reversed the roles by mandating that the judge must defer to jury recommendation unless "the facts suggesting a sentence of death [are] so clear and convincing that virtually no reasonable person could differ." 322 So.2d at 910. The practical import of Tedder is to place the trial judge in the unenviable position of either following the statute and basing his sentence upon a weighing of the aggravating and mitigating factors or following *851 Tedder. During 1984-85, we affirmed on direct appeal trial judge overrides in eleven of fifteen cases, seventy-three percent. By contrast, during 1986 and 1987, we have affirmed overrides in only two of eleven cases, less than twenty percent. This current reversal rate of over eighty percent is a strong indicator to judges that they should place less reliance on their independent weighing of aggravation and mitigation and more reliance on the indecipherable recommendation of the jury. If we continue to follow Tedder the independent sentencing judgment of trial courts becomes more and more debatable. This brings into question the constitutionality of our death penalty statute as applied.[5]Caldwell.
For the reasons set forth above, I feel that the only forthright position is to recede from Tedder and announce to one and all that the only useful purpose of the advisory recommendation of the jury under our death penalty statute is to apprise the trial judge and appellate court of the jury's reaction to the evidence of aggravation and mitigation as a matter of information. Short of a revision of section 921.141 to place the sentencing responsibility upon the jury and to require factual findings on which to base appellate review, the jury recommendation does not carry the great weight assigned to it by Tedder. It is as its designation indicates, advisory only, nothing more, nothing less.
BARKETT, Justice, concurring in part, dissenting in part.
I concur in affirming the conviction in this case. As to the sentence, I agree that the majority's Caldwell analysis is compelled by this Court's prior rulings. However, I adhere to my view that Caldwell indeed is applicable to the Florida advisory jury as well as the judge, since both exercise sentencing discretion. See Combs v. State, 525 So.2d 853 (Fla. 1988) (Barkett, J., specially concurring); Foster v. State, 518 So.2d 901 (Fla. 1987) (Barkett, J., specially concurring); Phillips v. Dugger, 515 So.2d 227 (Fla. 1987) (Barkett, J., specially concurring).
As to the Van Royal issue, I agree with the decision to promulgate a new procedural rule requiring the entry of a written order prior to the oral pronouncement of a sentence of death. However, unlike the majority, I cannot agree that the procedure followed in this instance met the statutory requirements already existing in this state. Specifically, I do not believe a trial judge may support the death sentence with written "findings" made three months after sentencing when he failed to enter specific oral findings at the time death was imposed. In the proceedings below, the trial judge made the following "findings" at sentencing:
The Court has considered the aggravating and mitigating circumstances presented in evidence in this case and has considered the recommendation of the jury and the recommendation included in the presentence investigation and determined that sufficient aggravating circumstances exist and that there are insufficient mitigating circumstances to outweigh the aggravating circumstances.
Section 921.141(3), Florida Statutes (1983), requires that a death sentence be based upon specific circumstances. The plain import of the statute is that death may not be imposed if the trial judge does not have specific reasons for doing so; and I cannot agree that it is permissible to formulate those reasons after the fact. Moreover, I fail to see how the judge had jurisdiction to enter findings of fact after the matter had been appealed to this Court. I cannot subscribe to the majority's suggestion that Muehleman stands for the proposition that *852 in retaining concurrent jurisdiction for purposes of transmitting the record, the trial court also retains jurisdiction for preparing a document statutorily crucial to this Court's appellate review.
I also write separately to address the views in Justice Shaw's special concurrence. Although these views are inapplicable to this case because this jury recommended death, I cannot leave unchallenged the suggestion that the Tedder standard may be unconstitutional. To the contrary, the United States Supreme Court has expressly upheld the validity of Tedder and has suggested that the Florida death penalty statute is constitutional at least partially because of it:
This crucial protection [the Tedder standard] demonstrates that the new statute affords significantly more safeguards to the defendant than did the old. Death is not automatic, absent a jury recommendation of mercy, as it was under the old procedure. A jury recommendation of life may be overridden by the trial judge only under the exacting standards of Tedder. Hence, defendants are not significantly disadvantaged vis-a-vis the recommendation of life by the jury... .
Dobbert v. Florida, 432 U.S. 282, 295-96, 97 S.Ct. 2290, 2299-2300, 53 L.Ed.2d 344 (1977) (footnote omitted). Accord Spaziano v. Florida, 468 U.S. 447, 465, 104 S.Ct. 3154, 3165, 82 L.Ed.2d 340 (1984) (Tedder standard expressly upheld as constitutional); Barclay v. Florida, 463 U.S. 939, 955-56, 103 S.Ct. 3418, 3427-3428, 77 L.Ed.2d 1134 (1983) (Tedder standard cited as a factor contributing to individualized sentencing); Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976) (discussing Tedder in upholding Florida statute).
Moreover, in his discussion of Spaziano, Justice Shaw fails to note that the Supreme Court in that case sustained Tedder against the precise criticism he now levels. Instead of finding that Tedder resulted in unequal treatment between some defendants who received a life recommendation and some who did not, the Spaziano Court found that
[w]e see nothing that suggests that the application of the jury-override procedure has resulted in arbitrary or discriminatory application of the death penalty, either in general or in this particular case.
468 U.S. at 466, 104 S.Ct. at 3165. I also cannot agree that Tedder rested on the rationale contained in Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), and thus does not comport with Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). Tedder does not cite or even allude to Witherspoon, and was decided some three years after Furman at a time when this Court was acutely aware of Furman's dictates. In any event, this issue already has been settled in favor of the Tedder standard. Dobbert, 432 U.S. at 295-96, 97 S.Ct. at 2299-2300.
In the same vein, I cannot agree that Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), which clarified Witherspoon in light of Furman, has any applicability to the issue raised by Justice Shaw. Witt is concerned not with specific sentencing and appellate procedures to be followed in ensuring reliability of the death penalty, but with the reasons for which jurors can be excluded from a capital panel. It is the former, not the latter, that is primarily the concern of the Furman line of cases. See Proffitt, 428 U.S. at 253, 96 S.Ct. at 2967 (Furman requires procedures that establish a meaningful basis for distinguishing death cases from non-death cases). The United States Supreme Court authoritatively has ruled that reliability is advanced in Florida at least partly because of Tedder. Dobbert, 432 U.S. at 295-96, 97 S.Ct. at 2299-2300.
Furthermore, I cannot agree with Justice Shaw's implication that Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), may be violated by Tedder. First, over my own objection, this Court repeatedly has ruled that Caldwell has no application in Florida. Combs; Foster; Phillips. If this is true, then it necessarily follows that Tedder does not violate Caldwell. Second, I do not agree that Tedder somehow obscures the identity of the sentencer. This assumes that only the judge *853 or jury can be the sentencer, but not both. I can find no federal case law advancing this assumption, and the Supreme Court in fact has held that no specific method of sentencing is required if the procedures employed promote reliability, Spaziano, 468 U.S. at 464, 104 S.Ct. at 3164, as Florida's manifestly does. Id.; Barclay; Dobbert; Proffitt. Since Caldwell focuses on the exercise of sentencing discretion, the Tedder standard necessarily means that both judge and jury constitute the sentencer for Caldwell purposes because both exercise this discretion.[1]
Finally, any controversy over who actually is the sentencer in Florida is not the kind of concern properly characterized as a Caldwell problem. Under Justice O'Connor's concurring opinion,[2]Caldwell addresses only erroneous statements made to the jury that minimize their sense of responsibility. 472 U.S. at 341-43, 105 S.Ct. at 2646-2647. It does not concern a procedure mandated by the law of Florida as interpreted by this Court in Tedder. As Justice O'Connor noted,

a misleading picture of the jury's role is not sanctioned [under federal case law]... . But neither does [this case law] suggest that the Federal Constitution prohibits the giving of accurate instructions regarding postsentencing procedures.
472 U.S. at 342, 105 S.Ct. at 2646 (emphasis added). I fail to see how a standard required by Florida law and expressly approved by the United States Supreme Court runs afoul of Justice O'Connor's Caldwell analysis, since it hardly paints "a misleading picture of the jury's role."
For these reasons, I conclude that Tedder is valid under the Constitution and should remain a part of the law of Florida. As the nation's highest court has noted, Tedder affords defendants "a crucial protection," Dobbert, 432 U.S. at 295, 97 S.Ct. at 2299, and is a "significant safeguard." Spaziano, 468 U.S. at 465, 104 S.Ct. at 3165. Moreover, in the dozen years since Tedder issued, the legislature has never voted to overrule this Court. A rule so firmly established in twelve years of voluminous jurisprudence should not be overruled for reasons that have been rejected by the United States Supreme Court and our own legislature.
NOTES
[1] We have also held that a jury recommendation of death should be given great weight. Ross v. State, 386 So.2d 1191, 1197 (Fla. 1980); LeDuc v. State, 365 So.2d 149, 151 (Fla. 1978), cert. denied, 444 U.S. 885, 100 S.Ct. 175, 62 L.Ed.2d 114 (1979).
[2] Appellant, who is 6'3" and 225 pounds, was approximately a foot taller and 100 pounds heavier than the officer.
[3] The ferocity of the attack is partially explained by appellant's contemptuous statement to Brewer that he was not going to be arrested by a woman.
[4] The Court was careful to state that its decision implied no opinion as to the use of victim impact statements in non-capital cases.
[5] Like the Booth court, we limit our holding to death penalty cases.
[6] Prior to 1984, only the victim of a crime could testify during the sentencing proceeding as to its impact. Since § 921.143 was amended by ch. 84-363, Laws of Fla., the next-of-kin of homicide victims are permitted to testify on the impact of the homicide. Presentence investigation (PSI) reports may also include information on victim impact. Here, for example, the PSI included the following:

James Park, the victim's father, states "I think he's shattered our family. This girl was kind of the center of our family. It's like taking my heart out. It will hurt me the rest of my life. We have all seen a psychiatrist or psychologist at least twice including my other two children. My personal feeling is that he should receive the death penalty."
It is not unusual in Florida for the PSI reports to contain statements from the victim's family relating the hurt wrought upon them by the crime. If the mere fact that the trial judge (the sentencer in Florida) is exposed to such a report is sufficient to render the error per se reversible, all death penalties in Florida are potentially subject to automatic reversal.
[7] Those three rights or violations were identified as a coerced confession, the right to counsel and an impartial judge. The Court has since held that an involuntary confession erroneously admitted into evidence may be held harmless beyond a reasonable doubt. Milton v. Wainwright, 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972). In Milton, the involuntary confession contained essentially the same information as that in three other confessions which were properly admitted. Recently, in Van Arsdall, the Court omitted a coerced confession from the list of constitutional violations which mandate automatic reversal, but see Rose, another 1986 case in which the Court cites Chapman with approval and remands for application of the Chapman standard.
[8] The findings are as follows:

The Defendant, MARTIN GROSSMAN, was found guilty of the crime of Murder in the First Degree of Peggy Park, the verdict being returned on October 29, 1985. On October 31, 1985, this Court conducted the penalty phase of the trial and both the State and the defendant presented evidence as to aggravating and mitigating circumstances. After approximately one (1) hour and fifteen (15) minutes of deliberation, the jury returned a recommendation to the Court that it impose a sentence of death upon Martin Grossman, by a vote of twelve (12) to zero (O). The Court ordered a Presentence Investigation in an effort to gain additional insight into the Defendant's background, and the matter came on for sentencing on December 13, 1985.
The Court imposed a sentence of death after having found as aggravating circumstances, the following:
1. The crime for which the Defendant is to be sentenced was committed while he was engaged in the commission of or an attempt to commit or flight after committing or attempting to commit the crime of Robbery or Burglary.
2. The crime for which the Defendant is to be sentenced was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody; or,
The crime for which the Defendant is to be sentenced was committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws; these aggravating circumstances to be treated only as one (1).
3. The crime for which the Defendant is to be sentenced was especially wicked, evil, atrocious or cruel, in that Peggy Parks, the deceased victim, was much smaller than the Defendant, Martin Grossman, and was held down by him in the front seat of her police vehicle and repeatedly struck on or about her head with her metal flashlight, causing innumerable deep lacerations on her head, resulting in extreme pain, but according to the medical examiner, not causing her to be rendered unconscious; then, with the deceased victim, Peggy Parks, in this helpless position, taking her gun, all of which she realized as was reflected by the evidence presented during trial, and using her weapon to end her life.
The only mitigating circumstance which would have been found as a result of the testimony presented in behalf of the Defendant and the Presentence Investigation, was that the Defendant was nineteen (19) years old at the time the crime was committed. However, this Court does not feel that this constituted a mitigating circumstance in this case.
The Court does not find any other aspect of the Defendant's character or record, or any other circumstances of the offense as reflected in the testimony presented at trial and in the penalty phase to be mitigating factor.
The Court hereby finds that the aggravating circumstances far outweigh the mitigating circumstances and that the death penalty is the appropriate sentence in this case.
[9] This is not surprising in that judges are routinely exposed to inadmissible or irrelevant evidence but are disciplined by the demands of the office to block out information which is not relevant to the matter at hand.
[1] Tedder v. State, 322 So.2d 908 (Fla. 1975).
[2] Justice White, in his dissent to Lockett v. Ohio, 438 U.S. 586, 621, 98 S.Ct. 2954, 2981, 57 L.Ed.2d 973, 1000 (1978) (White, J., dissenting), expressed a similar concern about the return of unbridled jury discretion. Id. at 623, 98 S.Ct. at 2982-83.
[3] See Richardson v. State, 437 So.2d 1091 (Fla. 1983), and Odom v. State, 403 So.2d 936 (Fla. 1981), cert. denied, 456 U.S. 925, 102 S.Ct. 1970, 72 L.Ed.2d 440 (1982), which attribute the great weight given to the jury's recommendation to its reflection of the conscience or judgment of the community.
[4] The mandate of the Court in McGautha was later withheld and the judgment vacated and remanded for further proceedings consistent with Furman. 403 U.S. 951, 91 S.Ct. 2273, 29 L.Ed.2d 862; [Crampton v. Ohio], 408 U.S. 941, 92 S.Ct. 2873, 33 L.Ed.2d 765 (1972).
[5] In this connection, see Adams v. Wainwright, 804 F.2d 1526 (11th Cir.1986), modified by Adams v. Dugger, 816 F.2d 1493 (11th Cir.1987), and Mann v. Dugger, 817 F.2d 1471 (11th Cir.1987), vacated and rehearing granted en banc by Mann v. Dugger, 828 F.2d 1498 (11th Cir.1987), where the courts held that instructing the jury that the judge was the ultimate sentencer denigrated the jury role contrary to Tedder and in violation of Caldwell. It should be noted under Florida law that all capital punishment juries are instructed that the judge is the ultimate sentencer. The practical effect of Adams and Mann is to hold Florida's death penalty statute unconstitutional as applied.
[1] In the same vein, I cannot agree with Justice Shaw's interpretation of Adams v. Wainwright, 804 F.2d 1526 (11th Cir.1986), modified, 816 F.2d 1493 (1987). Adams clearly was grounded on the fact that the trial judge made several erroneous statements not contained in the standard jury instructions. These statements included observations that the jury recommendation could be disregarded and that jurors were not to trouble their consciences with it. 804 F.2d at 1528, 1532-33 & n. 8; 816 F.2d at 1501 n. 9. There is nothing in Adams suggesting that the standard jury instructions themselves were the source of the error.
[2] This concurrence is the ground upon which a majority of the Caldwell court agreed.