661 So.2d 288 (1995)
Brian Keith GIBSON, Appellant,
v.
STATE of Florida, Appellee.
No. 81769.
Supreme Court of Florida.
October 5, 1995.
*289 James Marion Moorman, Public Defender and Paul C. Helm, Assistant Public Defender, Bartow, for Appellant.
Robert A. Butterworth, Attorney General and Robert J. Landry, Assistant Attorney General, Tampa, for Appellee.
PER CURIAM.
This is an appeal by Brian Keith Gibson from his criminal convictions and sentences, including a conviction for first-degree murder and a sentence of death. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. We affirm appellant's convictions but remand for resentencing, and, because the trial judge failed to enter written sentencing orders in accord with statutory and case law, we vacate Gibson's sentence of death.

FACTS
The following facts are based on the evidence presented at trial. In the morning hours of September 30, 1991, Lupita Luevano was murdered in her home. Richard Murrish, her live-in boyfriend, found her nearly nude body lying face down on the bed of the master bedroom. The room was in disarray and the contents of her purse were scattered on the floor, although nothing of value was missing. Murrish also observed that the bed was twisted sideways, and the dresser had been moved. Blood was splattered on the walls, floor, dresser, and ceiling. Next to Luevano's body was a barbell with a three-pound weight attached, and a three-pound weight was also found at the foot of the bed. An autopsy showed that Luevano had likely died of blunt injuries to the face and skull, although, based on bruising on the back of her neck, the medical examiner could not rule out strangulation as a contributing factor.
The police found an Indianhead charm underneath the master bedroom bed and a gold chain on the bed. A shirt was tied around part of Luevano's face and neck. Her underwear was ripped and pulled up around her waist, and a pair of white shorts was found next to her body. In the back bedroom, they discovered an open jalousie with a cut screen and fingerprint smudges on the wall below the window. Inside the room, a green towel was found on the bed that appeared to have blood on it. Outside, beneath the open window, the police found a ladder, cement block, bucket, and an unopened bottle of a soft drink, Sprite. The officers also observed a shoe print with a triangular, diamond, or round dimple pattern; however, a pattern cast was never taken. A portion of the back fence was pressed down and it looked like someone had been standing there in the grass.
Gibson had reported to work at approximately 4 a.m. on September 30 at the Clewiston Fertilizer Plant, located across a canal from Luevano's home. That morning, Gibson was working alongside three other men: Jay Odum, Kenneth Bryant, and Matthew Street. At approximately 4:43 a.m., Gibson weighed in a truckload of fertilizer. At 6:30 a.m., when Odum received an order to mix another load of fertilizer, Gibson could not be located and the load was made without him. All three of his co-workers testified that they did not see Gibson for the hour and a half preceding that second load. Sometime between 7:15 and 7:30 a.m., when Gibson returned to the plant, Odum noticed Gibson had fresh scratches on his face and a bruise under his eye, injuries that were not present earlier that morning. Bryant testified that Gibson looked like he had been in a fight. Several other co-workers also testified that Gibson looked like he had been fighting because of the scratches on his face on the morning of the murder. When asked how he sustained the scratches, Gibson gave contradictory stories to various individuals.
Randy Perryman, an employee at Super Stop, a convenience store near the plant, testified that Gibson entered his store about 5:30 a.m. on September 30 and purchased a bottle of Sprite. Kimberly Murphy, a dispatcher/bookkeeper at Gibson's workplace, testified that on the morning of the murder, between 7:10 a.m. and 7:15 a.m., she saw Gibson off plant property walking along the *290 canal. She noticed he was wearing a white T-shirt and work pants or blue jeans, but she did not notice any stains on his clothing.
The police received an anonymous call on the morning of the murder that a Mexican male was seen running towards the Cuban market, but no witnesses verified this report. Several of his co-workers testified that Gibson told them that he had seen a Mexican male running towards the market.
A few days after the murder, and after Gibson was given Miranda warnings, he gave police a taped statement. He told police that on the morning of the murder he had seen a Hispanic male running from the direction of Luevano's home holding his stomach. During this interview, Detective Cassells noticed scratches under Gibson's eye and chin. Gibson stated that his dog had injured him. Approximately eleven days after his initial statement, Gibson was asked to come to the police station to discuss the chain and charm found at the murder scene. At this time, Gibson told police that his jewelry was at home, and they could verify its identity with his wife Roxanne. Numerous witnesses, including Gibson's wife and girlfriend, identified the Indianhead charm and gold chain found at the murder scene as Gibson's. In addition, DNA evidence matching Gibson's was found in Luevano's vaginal area and at the scene, and Gibson's fingerprints were found outside the window of the Luevano residence.
The jury found Gibson guilty of all counts. As to the murder charge, the jury recommended death by a vote of seven to five. The trial court orally approved the jury's recommendation and orally sentenced Gibson to death. No written sentencing order was ever entered. As to the burglary count, the trial court departed from the sentencing guidelines and imposed a life sentence consecutive to the death sentence, but also failed to provide written reasons for the departure sentence.

GUILT PHASE CLAIMS
Gibson raises three claims[1] relating to the guilt phase of the trial: (1) The trial court violated Gibson's right to be present and to the assistance of counsel by denying his counsel's request to consult with Gibson before exercising peremptory challenges. (2) The trial court violated Gibson's right to confront adverse witnesses by limiting his cross-examination of his wife. (3) The trial court erred by admitting the testimony of his wife and his girlfriend concerning his requests to have anal intercourse with them.

JURY SELECTION
During a small portion of a long jury selection process, Gibson's lawyer asked the trial court whether he could take a ten-minute recess to permit him to consult with his client:
Mr. Rinard: Your Honor, if I may have  if we may take an afternoon recess so I may have ten minutes or so to speak with Mr. Gibson to advise him of some things and see how he would like for me to proceed.
The Court: Let's proceed with this round. Are there any additional challenges for cause?
By this exchange, it is apparent the trial court implicitly denied counsel's request for a recess, and directed counsel to proceed with his challenges for cause. The record reflects that immediately thereafter, without further comment or objection, Gibson's counsel began making challenges for cause to the jury panel.
Based on this brief exchange, Gibson claims error in two respects. First, he argues that the trial court violated his right to be present with counsel during the challenging of jurors by conducting the challenges in a bench conference. Second, he argues that the trial court violated his right to the assistance of counsel by denying defense counsel's request to consult with Gibson before exercising peremptory challenges.
In Steinhorst v. State, 412 So.2d 332 (Fla. 1982), we said that, "in order for an argument to be cognizable on appeal, it must be the specific contention asserted as legal *291 ground for the objection, exception, or motion below." In this case, we find that Gibson's lawyer did not raise the issue that is now being asserted on appeal. If counsel wanted to consult with his client over which jurors to exclude and to admit, he did not convey this to the trial court. On the record, he asked for an afternoon recess for the general purpose of meeting with his client. Further, there is no indication in this record that Gibson was prevented or limited in any way from consulting with his counsel concerning the exercise of juror challenges. On this record, no objection to the court's procedure was ever made. In short, Gibson has demonstrated neither error nor prejudice on the record before this Court. Cf. Coney v. State, 653 So.2d 1009, 1013 (Fla. 1995) (holding trial court's error in conducting pretrial conference where juror challenges were exercised in absence of defendant was harmless beyond reasonable doubt).

CROSS-EXAMINATION
Gibson's second challenge to the guilt phase of his trial concerns the trial court's alleged error in limiting his cross-examination of his wife, Roxanne, as to whether she had heard he was having an affair with the victim. Gibson claims this question was critical to demonstrate her motive and bias in testifying against him.
Initially, we agree with Gibson that Roxanne's state of mind and possible motive for testifying were permissible subjects for inquiry. Our evidence code liberally permits the introduction of evidence to show the bias or motive of a witness. In relevant part, section 90.608(2) states:
Any party, including the party calling the witness, may attack the credibility of a witness by:
(2) Showing that the witness is biased.
§ 90.608(2), Fla. Stat. (1993). We further recognize that a defendant's right to cross-examine witnesses is secured by the Sixth Amendment to the United States Constitution and article I, section 16 of the Florida Constitution. Inherent within this right is a defendant's right to expose a witness's motivation in testifying because it is "the principal means by which the believability of a witness and the truth of his testimony are tested." Davis v. Alaska, 415 U.S. 308, 316, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347, 353 (1974); Steinhorst v. State, 412 So.2d 332, 337 (Fla. 1982). Accordingly, we find it was error to prohibit this inquiry of Roxanne.
However, we conclude this error is harmless. Through another line of questioning, Gibson was given an opportunity to expose Roxanne's potential bias. For example, Roxanne acknowledged that she knew Gibson was having an affair with Tracy Grass, another State witness, and it was also disclosed that Roxanne was having an affair with another man. Indeed, it was established that she had a child with another man. In light of this testimony and evidence, and the substantial evidence of Gibson's guilt, we conclude that the trial court's error in limiting Gibson's cross-examination of Roxanne was harmless beyond a reasonable doubt because there is no reasonable possibility that the error could have affected the verdict.

SEXUAL PROPENSITIES
We reach the same conclusion with regard to Gibson's last claim of error during the guilt phase. During the trial, the prosecutor was permitted, over the objections of defense counsel, to question both Gibson's wife, Roxanne, and his girlfriend, Tracy Grass, about Gibson's requests to have anal intercourse with them. In response to defense counsel's objection, the prosecution argued that inquiry about Gibson's sexual habits was relevant because the medical examiner had found a slight tear in Luevano's anal area, and hence this evidence would establish Gibson's identity as the perpetrator of the crime. Both the wife and the girlfriend testified over objection that Gibson had asked to have anal intercourse with them. However, on cross-examination they both testified that they had declined his invitation, and that he in no way attempted to have anal intercourse with them. This case is similar to our recent decision in Hayes v. State, 660 So.2d 257 (Fla. 1995), where we held that a defendant's altercation with a prior girlfriend was not admissible to prove a subsequent violent attack on another woman. In Hayes we stated:

*292 In the instant case, the State sought to prove the identity of the murderer by showing a pattern of allegedly similar behavior by Hayes on a prior occasion. We conclude that, consistent with Drake [v. State], [400 So.2d 1217 (Fla. 1981)], there are insufficient points of similarity to the instant offense to warrant admitting evidence of the previous attack. We note that the victim in the prior offense had voluntarily gone out with Hayes before she and Hayes returned to her room, that the victim did not testify that Hayes had sexually assaulted her, that Hayes was charged with only a simple assault (a charge that was later dropped), and that Hayes released the victim and allowed her to leave the room. We also find that any marginal relevance the prior attack may have had to the instant case was substantially outweighed by its prejudicial effect. See § 90.403, Fla. Stat. (1993). In fact, the differences in this case are considerably greater than the differences in Drake. Accordingly, we find that the trial judge erroneously admitted the evidence of the previous attack.
Id. at 261-62.
As in Hayes, we find that Gibson's conversations with his wife and girlfriend about anal intercourse do not constitute materially relevant evidence to establish that he was the person that violently abused the victim here. This evidence has no more relevance, for example, than a defendant's consensual sexual activities would go to prove the same defendant's commission of a violent sexual battery. Rather, it appears this evidence was used exclusively for the improper purpose of showing Gibson's bad character and sexual propensities. Further, in view of the overwhelming evidence against the defendant, this appears to be a classic case of prosecutorial overkill.
However, like the error concerning the cross-examination of Gibson's wife, we conclude beyond a reasonable doubt that the error in allowing presentation of this testimony was harmless. See State v. DiGuilio, 491 So.2d 1129, 1139 (Fla. 1986). We have already noted that both the wife and the girlfriend testified that Gibson did not press his request for anal intercourse with them. Fortunately, also, this matter was not emphasized or made a feature of the trial. More importantly, the evidence against Gibson, as outlined above in great detail, was overwhelming. Absent eyewitness identification and a confession, it is difficult to imagine a case in which the State could assemble a more compelling body of evidence. Considering the entire record, we conclude that the error was harmless because it is not reasonably possible that the error could have affected the verdict.

PENALTY PHASE
Gibson raises four issues in the capital penalty phase.[2] We need only address one of these, albeit the most serious. Inexplicably, the record reflects that the trial court failed to file a written order of any kind in support of the death sentence as explicitly required by section 921.141(3), Florida Statutes, (1993), and this Court's substantial case law precedent. Christopher v. State, 583 So.2d 642, 646 (Fla. 1991); Stewart v. State, 549 So.2d 171, 176 (Fla. 1989), cert. denied, 497 U.S. 1032, 110 S.Ct. 3294, 111 L.Ed.2d 802 (1990); Grossman v. State, 525 So.2d 833, 841 (Fla. 1988), cert. denied, 489 U.S. 1071, 109 S.Ct. 1354, 103 L.Ed.2d 822 (1989). This is a clear and gross violation of established law, and has the effect of invalidating *293 the death sentence.[3] With admirable candor, on appeal, the State concedes that the trial court did not file the required written order setting forth its findings. Further, the record contains a certification from the clerk of the court that no written order was ever prepared or filed.
Recently, we were presented with a similar, although less egregious, situation and held:
At the sentencing, instead of preparing a written order prior to the oral pronouncement and filing it concurrently with the oral pronouncement, the judge directed the court reporter to transcribe his oral findings and submit them for inclusion into the court file. We find that the trial court's action in this respect violated the procedural rule for written orders imposing a death sentence set forth by this Court in Grossman v. State, 525 So.2d 833, 841 (Fla. 1988), cert. denied, 489 U.S. 1071, 109 S.Ct. 1354, 103 L.Ed.2d 822 (1989).
In Grossman, we mandated that "all written orders imposing a death sentence be prepared prior to the oral pronouncement of sentence for filing concurrent with the pronouncement." The purpose of this requirement is to reinforce the court's obligation to think through its sentencing decision and to ensure that written reasons are not merely an after-the-fact rationalization for a hastily reasoned initial decision imposing death. Further, this Court held in Stewart v. State, 549 So.2d 171, 176 (Fla. 1989), cert. denied, 497 U.S. 1032, 110 S.Ct. 3294, 111 L.Ed.2d 802 (1990), that "[s]hould a trial court fail to provide timely written findings in a sentencing proceeding taking place after our decision in Grossman, we are compelled to remand for imposition of a life sentence."
Perez v. State, 648 So.2d 715 (Fla. 1995) (citation omitted). In Perez, unlike here, the trial court made some, albeit inadequate, attempt to comply with the statutory mandate of written findings in support of a sentence of death by ordering a transcription of the oral sentencing. As this record reflects, the trial judge here made absolutely no effort to submit a written order, either before his oral pronouncement of sentence or after the sentence was rendered.
We explained in Christopher v. State, 583 So.2d 642, 646 (Fla. 1991), that our holding in Grossman regarding this matter "is more than a mere technicality. The statute itself requires the imposition of a life sentence if the written findings are not made." See also Bouie v. State, 559 So.2d 1113 (Fla. 1990) (affirming conviction but vacating death sentence and remanding with directions to trial court to reduce sentence to life imprisonment where court order did not indicate which aggravating and mitigating circumstances were applicable in sentence of death).
Thus, we find the trial court's failure to make the requisite written findings as required by section 921.141(3) constitutes error. As a result, Gibson's sentence of death must be vacated. The trial court's failure to provide the required written findings bars the imposition of the death penalty and mandates the imposition of a life sentence. Christopher, 583 So.2d at 646.

SENTENCING GUIDELINES
In addition, the trial court failed to enter a written order justifying his departure from the sentencing guidelines in sentencing Gibson to life on his burglary conviction. The trial court's error requires that we remand with directions for resentencing within the guidelines. Owens v. State, 598 So.2d 64 (Fla. 1992).
*294 Accordingly, we affirm Gibson's convictions but vacate his sentences and remand for further proceedings consistent herewith.
It is so ordered.
GRIMES, C.J., and OVERTON, SHAW, KOGAN, HARDING and ANSTEAD, JJ., concur.
WELLS, J., concurs in part and dissents in part with an opinion.
WELLS, Justice, concurring in part and dissenting in part.
I concur in the affirmance of the convictions and as to the reversal for failure to file written reasons for the guidelines departure with respect to the burglary conviction. I dissent as to setting aside the death sentence.
I agree with the majority that the trial judge did not apply the clear decisions of this Court. This trial judge apparently did not know of this Court's decisions in Stewart v. State, 549 So.2d 171 (Fla. 1989), cert. denied, 497 U.S. 1032, 110 S.Ct. 3294, 111 L.Ed.2d 802 (1990), Grossman v. State, 525 So.2d 833 (Fla. 1988), cert. denied, 489 U.S. 1071, 109 S.Ct. 1354, 103 L.Ed.2d 822 (1989), and the other decisions of this Court which followed them. Those decisions have only to be read to be understood to require the preparation of a written sentencing order before a death sentence is pronounced. The error is simply inexplicable. Before pronouncing sentence the following occurred:
THE COURT: Anything further by the defense?
MR. RINARD: No, Your Honor.
THE COURT: Anything the state would like to present in response?
MS. POLSTER: Nothing further, Your Honor.
THE COURT: If there is nothing further, I'll proceed with Mr. Gibson and counsel alone before the bench. Everyone else may be seated, as far as any other witnesses.
After approximately three weeks of trial, two days of consideration of penalty phase by the jury, having ordered the presentence investigation report, reviewed it, and given great reflection to the sentence in this case, I'm prepared to pronounce sentence in this matter.
The trial judge and all counsel are responsible for the error in failing to follow those cases.
Though I recognize and do not approve of the trial judge's error, I again dissent from what I believe to be a misplaced sanction. See Layman v. State, 652 So.2d 373, 376 (Fla. 1995) (Wells, J., concurring in part and dissenting in part). I cannot follow the reasoning of setting aside the death penalty as a sanction for the trial court's failure to follow the rules of those cases in respect to the preparation and timing of the sentencing order. It is obvious that this trial judge was oblivious to this sanction, which was in decisions of this Court more than three years before this trial. I am concerned that the greatest effect of this sanction is to thwart the legislative intent that the courts of this state enforce the capital punishment statute and to exacerbate the public's lack of confidence in their courts' capability to competently administer justice.
I believe this case is illustrative of why we should recede from this sanction, first mandated by this Court's decision in Stewart. I do not agree that section 921.141(3), Florida Statutes (1993), requires this sanction for failure of the trial judge to set forth the findings in writing. The statute only requires that a death sentence be set aside if the court "does not make the findings requiring the death sentence." In this case, the trial judge made "the findings" by dictating the findings to the court reporter. It appears to me that what is being enforced here is not a requirement of the statute but rather a rule developed by this Court.
If rules developed by this Court are ignored intentionally or repeatedly because of incompetence, it would be better to deal with the problem through judicial and professional discipline than through a sanction which prevents sentencing based upon the facts of a particular case. In this way we do not allow sentencing in a particular case to become the victim of the misfeasance of the trial judge and counsel. We also do not make a convicted *295 murderer the beneficiary of a trial judge's error.
NOTES
[1] Although not raised as an issue, we find the evidence sufficient to sustain Gibson's convictions, including his conviction for first-degree murder.
[2] Gibson raises several other issues:

1. The trial court erred by admitting gruesome crime scene and autopsy photographs of the victim of the prior murder because their prejudicial effect outweighed their probative value;
2. The trial court violated Gibson's right to due process of law by admitting irrelevant victim impact evidence and by finding nonstatutory aggravating circumstances based upon such evidence;
3. The trial court erred by instructing the jury on and orally finding aggravating circumstances which were not proven beyond a reasonable doubt;
4. The trial court violated the Eighth and Fourteenth Amendments by giving vague and overbroad jury instructions on the heinous, atrocious, or cruel and cold, calculated, and premeditated aggravating circumstances; and
5. The trial court erred by failing to find and weigh proven mitigating circumstances.
[3] The legislature passed a bill in the 1995 session that would have provided trial judges an extra 30 days to enter written findings:

In each case in which the court imposes the death sentence, the determination of the court shall be supported by specific written findings of fact based upon the circumstances in subsections (5) and (6) and upon the records of the trial court and the sentencing proceedings. If the court does not make the findings requiring the death sentence within 30 days of the rendition of the judgment and sentence, the court shall impose sentence of life imprisonment in accordance with section 775.082.
Fla. HB 1319, § 3 (1995) (emphasis added). However, this bill, along with other amendments to the capital sentencing statute, was vetoed and did not become law. Of course, the bill would not have applied here, and, in any case, the trial court here never entered a written sentencing order in any time frame, much less within 30 days.